(948 P.2d 1150)
No. 76,394

GARVEY ELEVATORS, INC. and its Representatives, *Appellees*, v. KANSAS HUMAN RIGHTS COMMISSION and ELI A. JACKSON, *Appellants*.

Opinion filed December 5, 1997.

*Glenn Grayson*, staff attorney, of Kansas Human Rights Commission, for appellants.

*John W. Jordan*, of Wichita, for appellees.

Before KNUDSON, P.J., ROYSE, J., and J. STEPHEN NYSWONGER, District Judge, assigned.

KNUDSON, J.: Eli A. Jackson filed a complaint against Garvey Elevators, Inc., (Garvey) before the Kansas Human Rights Commission (Commission) pursuant to the Kansas Acts Against Discrimination, K.S.A. 44-1001 *et seq.* Jackson, an African-American, alleges that because of his race he was subjected to unlawful employment practices prohibited under K.S.A. 44-1009(a)(1). He contends that while employed by Garvey, he was subjected to harassment and differential treatment because of his race. He further contends that these racially motivated abuses caused him to quit his job. The hearing examiner's decision in favor of Jackson was adopted by the Commission. Garvey appealed to the district court of Sedgwick County where the decision was set aside and Jackson's

complaint dismissed. The Commission and Jackson have now appealed to this court, contending the district court arbitrarily disregarded undisputed evidence and its findings and conclusions are not supported by substantial competent evidence.

We reverse the decision of the district court and remand this case to the district court for rehearing because the uncontroverted evidence establishes there did exist a racially hostile work environment tolerated by management, and the district court must determine whether there was a constructive discharge from employment and then craft an appropriate final order under K.S.A. 44-1005. Our decision requires a detailed narrative of the underlying circumstances that allowed rampant racism to go unchecked during Jackson's employment with Garvey.

Jackson began working for Garvey in October 1983 after 23 years of employment with the Pillsbury Company Elevator, with the last 13 years as elevator superintendent. He was hired by Garvey to work at its Wichita terminal elevator as an assistant superintendent. He continued in that supervisory position until he left the employment in April 1989.

Garvey is a grain storage company with administrative offices in Hutchinson, Kansas. The Wichita terminal is actually two separate elevator facilities designated by the company as the west elevator and the east elevator. There were 21 employees at the terminal, including three supervisory positions. Jackson was hired to manage the east elevator. The west elevator was managed by Harry Bell. These two men were supervised by Clarence Schwemmer, who was superintendent of the entire terminal. Schwemmer reported to the vice-president in charge of terminal operations, whose office was in Hutchinson. When Jackson first began employment with Garvey, the vice-president was John Hirsch. After Hirsch retired, Harold Deardoff, an executive vice-president of Garvey, assumed Hirsch's duties.

Schwemmer and Bell are Caucasian. Both had worked for Garvey for many years before Jackson was employed. Schwemmer and Bell shared an office in the west elevator. Much of the communication between the west and east elevators was by two-way radio.

In the west elevator the radio was located on Schwemmer and Bell's desk.

The evidence in the record on appeal is persuasive that Harry Bell is a racist.

Jackson testified that shortly after he began working at Garvey, Bell began making derogatory racial statements. The first statement Jackson could recall occurred approximately 3 to 4 months after Jackson had been hired. He testified that while he and Stanley Robertson, an employee who also is an African-American, were standing in the room, Bell stated, " 'What do you think about those two nigger coaches?' " Robertson asked him what he said, and Bell then repeated the question.

On another occasion, Jackson was present when Bell told another employee that there was no time to shut down the facility to make repairs and the employee would have to " 'nigger-rig it.' " Jackson also testified about a comment Bell made that " 'if Blacks weren't so lazy our taxes wouldn't be so high.' "

Jackson testified about a comment he heard over the two-way radio used for communication between the east and west terminals. Bell was speaking with Robertson on the radio, and they were having difficulty hearing each other because of the connection. Robertson radioed Bell that the radio was fuzzy, and Bell called back and either said "no, it's not the radio that's fuzzy, it's the black man using it" or it was "those black voices."

Jackson testified that he complained to Schwemmer about the "black voices" comment made by Bell on the radio. Jackson testified he was extremely angry and Schwemmer told him to "cool off" and they would speak about the matter later. Jackson persisted and asked Schwemmer why he allowed Bell to "do and talk to people the way he does." Schwemmer replied that Bell could say and do anything he wanted, as long as Schwemmer said he could.

Schwemmer testified that he believed Bell was not making a derogatory racial comment but that Bell was just attempting to determine who was calling him on the radio. We note, however, Schwemmer does not dispute Jackson's complaint or Jackson's version of their conversation about the incident.

Jackson testified that the comments by Bell were of a continuous nature and occurred on a daily basis during his employment with Garvey. He attempted to avoid Bell whenever he could.

Jackson also presented the testimony of other Garvey employees, who testified to the racial comments they heard Bell make. Ken Byard, a Caucasian, was in charge of construction and maintenance. He testified that Bell made numerous racial remarks about Jackson. He testified that Bell told him, " 'it's hard enough for me to control these Mexicans let alone a nigger trying to do it.' " In addition, he testified that Bell would refer to Jackson's office in the east terminal as the " 'nigger hut.' " Byard stated that these type of comments occurred every time he came to the facility.

Stanley Robertson testified that he heard Bell make racial comments everyday, including the use of the words "nigger" and "Black ass." He testified that even before Jackson started working at Garvey, Bell was making derogatory racial comments about Jackson. On one occasion, Bell told Robertson that he could not understand how Pillsbury would let a "nigger" run the elevator. After Jackson started working at Garvey, Bell told Robertson that " 'if he wanted a Black boy or a colored man to run the elevator, we could have put you down there instead of Eli Jackson.' "

Robertson also testified that Bell would refer to a white employee who became friends with Robertson or Jackson as " 'what's a nigger.' " He also stated Bell made negative comments about Robertson driving a white man's car. Robertson also gave corroborative testimony regarding Bell's "nigger coaches" comments and added that Schwemmer was present during the exchange.

Robertson testified that he complained to both Schwemmer and Hirsch about Bell's racial comments.

Bob Baker testified that he heard Bell make derogatory racial comments on numerous occasions and that he had never seen so much racial prejudice in one place in his life. He recalled that Bell said that all black people were lazy and that Jackson's only problem was that he was black. Bell also told him that Jackson spoke just like a "nigger." He stated that there were many other racial comments that Bell made, but that he was unable to remember them at the time of his testimony. Finally, Baker testified that when the

decision was made to start a bin cleaning project, Bell stated that he was not going to have to be involved with it because the "nigger's going to do it."

Garvey presented the testimony of Schwemmer, who testified that he shared a desk with Bell and that he never ever heard Bell make a derogatory or a racist remark to anyone, and that they were a professional group and would not make racial comments. He stated that there was no racial animosity between any of the employees at Garvey, although he did admit that Jackson told him that Jackson felt his job assignments were racially motivated. Schwemmer maintained that Bell never used the word "nigger."

In addition, both Hirsch and Harold Deardoff testified that Jackson did not complain to them about those racial remarks by Bell. Hirsch testified that although Jackson informed him about the operational difficulties he was having, Jackson never informed him about any racial problems. Hirsch was not asked and did not testify whether any other person complained to him about the comments by Bell. We note, however, that Byard testified that Hirsch was aware of the racial comments by Bell and that Robertson testified that he told Hirsch about the racial problems when Robertson left Garvey's employment in 1986.

Despite Hirsch's testimony that Jackson did not complain to him about the racial problems, Jackson testified at length that he did inform Hirsch on more than one occasion about the problems.

Deardoff testified that Jackson never told him about the racial problems he was experiencing at Garvey. Jackson acknowledged he did not complain to Deardoff. Bob Baker, however, testified that he told Deardoff about the racial atmosphere on numerous occasions. He testified that Deardoff stated that although Bell and Schwemmer might be prejudiced, Deardoff said that he was not. Deardoff denied that Baker made any complaints to him regarding racism and noted Baker had brought an age discrimination claim against Garvey when he was laid off.

In 1989, the Wichita facility's business had decreased sufficiently that Deardoff made the decision to clean the grain storage bins. The bins had not been cleaned since Garvey bought the facility in 1974. Deardoff brought in Ken Cross, the manager of one of the

country elevators, to set up the project. Cross worked on the project for about one week. Deardoff testified that he then told Schwemmer that he wanted Jackson to begin supervising the bin cleaning project. He testified that he chose Jackson because the east elevator was not busy. Additionally, Deardoff stated that Schwemmer and Bell had indicated they would be retiring soon.

According to Jackson, Schwemmer said nothing to him about supervising the project. Jackson testified he was told by Schwemmer that he would be cleaning bins 3 days a week with other employees. Jackson also testified that Schwemmer told him the assignment would be temporary. After it became apparent to Jackson that the assignment was not merely temporary, he quit his employment with Garvey. Jackson testified that he felt that he was being "forced out" and that the discriminatory work assignments were starting again now that Hirsch was no longer working for Garvey.

Schwemmer initially testified on direct examination by Garvey's attorney that he clearly told Jackson he was to be the supervisor of the bin cleaning project and was not to do the manual labor inside the bins. However, on cross-examination, Schwemmer repeatedly explained that he was not told by Deardoff that Jackson would be the supervisor of the bin cleaning project. Schwemmer also admitted that he told Jackson that his work on the bin cleaning project would be temporary, although Schwemmer knew this was a long-term project.

Bob Baker testified that he observed Jackson during the bin cleaning operation and that Jackson always appeared to be in a supervisory position. In addition, Garvey produced records which showed that Jackson signed the bin entry permit indicating that it had been checked and approved for entry. The testimony was uncontroverted that the supervisor of the project was the person who would sign the entry permits.

Jackson argues that the district court's pivotal findings of fact are not supported by competent evidence and its findings are insufficient to support certain conclusions of law upon which its judgment is predicated.

Our standard of review is stated in *Beech Aircraft Corp. v. Kansas Human Rights Comm'n*, 254 Kan. 270, 275, 864 P.2d 1148 (1993):

"Where the district court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the district court's conclusions of law. [Citation omitted.] . . .

"Further, a negative finding that a party did not carry its requisite burden of proof will not be disturbed on appeal absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice. [Citations omitted.]"

Jackson contends that there is no substantial competent evidence to support numbered findings 17, 18, and 23 entered by the district court. They are as follows:

"17. With the exception of [a] phone call to Hirsch which preceded the memorandum in August, 1985, Jackson's complaints to Hirsch were presented solely as work related disputes without racial overtones.

"18. Hirsch and Jackson each held the other in high regard and on every occasion that Jackson came to Jack Hirsch with a complaint, Hirsch acted promptly to rectify the problem, and Jackson would concede that Hirsch stood by him 100%.

. . . .

"23. At the Commission hearing Jackson expanded on his initial complaints to allege that, during the course of his employment, Bell made other racial remarks in his presence (when no one else was present) and such remarks were a continuous thing. Bell did not testify to rebut the making of racial comments and no reasonable explanation was offered to explain his absence as a witness. Mr. Jackson indicated that the racial remarks had stopped by the time of his resignation evidently because Jackson avoided contact with Bell. Significantly, the only complaint Jackson made concerning racial remarks was a phone conversation in early 1985 with Mr. Hirsch. In the phone conversation (which preceded the 1985 meeting to clarify Jackson's job duties) Hirsch told Jackson he would take care of it. Thereafter, from mid-1985 to the time of his resignation in 1989, Jackson never reported to Hirsch or any other supervisor that the problem was not resolved or that the racial remarks continued."

Regarding findings 17 and 18, Jackson argues that he complained to Hirsch about the racial problems and notes that Hirsch did not testify that he told Bell to stop making the derogatory comments. He argues that there is no substantial evidence to rebut his testimony because Hirsch's testimony appeared totally confused as

to the sequence of events, some of which took place after Hirsch retired.

On the other hand, Hirsch testified Jackson never informed him of any racial problems. Hirsch testified that all of Jackson's complaints were concerning his duties as a supervisor and operational concerns.

The district court is the finder of fact with the discretion to determine the weight and credit to be given the testimony of witnesses. If there is substantial competent evidence in the record to support the district judge's findings, those findings will not be disturbed on appeal. See *Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988).

Under this standard, we conclude there is evidence to support numbered findings 17 and 18 of the district court.

Finding of fact 23 presents a more serious problem, not so much for what is stated but because of what is not stated that was uncontroverted by the evidence. Additionally, it illustrates the district court's underlying misconception that only Jackson's complaints of racism were important in determining whether there was a racially hostile work environment. This problem is compounded when relied upon by the district court to support its conclusion of law in numbered paragraph 14 that reads:

"14. Complainant has not met his burden to prove respondent knew or should have known of the 'continuous' racial comments by Harry Bell. Mr. Jackson tolerated the conduct by avoiding contact with Bell but *he made no reasonable effort to inform respondent of the problem.* The only complaint made was in early 1985 in a telephone call to Mr. Hirsch. No complaint was made about any racial comment from mid-1985 to the time of complainant's resignation in 1989, and *there is no persuasive evidence which leads the Court to conclude that respondent knew or should have known of the comments which complainant acknowledges occurred only when he was alone with Bell.* Respondent is not liable for a failure to act where it does not know and could not know of the problem. *Higgins v. Gates Rubber Co.*, [578 F.2d 281 (10th Cir. 1978)]." (Emphasis added.)

Throughout its findings and conclusions, the district court ignores the uncontroverted evidence that conclusively establishes: (a) Harry Bell is an outspoken racist, and (b) Clarence Schwemmer knew or should have reasonably known of Bell's racism and the effect of that racism on working conditions for Jackson and other

African-Americans working at the terminal. Both Jackson and Robertson complained to Schwemmer about Bell's racial remarks. Day in and day out, Schwemmer shared a desk with Bell. Schwemmer's testimony that he did not ever hear Bell make a racial comment is not susceptible to belief. It is wholly unreasonable to conclude Schwemmer did not have an awareness of Bell's racist attitudes.

Schwemmer was the superintendent of the terminal. What he knew or should have known is imputed to Garvey. We conclude that as a matter of law the evidence shows Jackson was subjected to a racially hostile work environment constituting an unlawful employment practice under K.S.A. 44-1009(a).

We next turn to Jackson's claim of disparate treatment at the hand of Garvey.

In *Woods v. Midwest Conveyer Co.*, 231 Kan. 763, 767-68, 648 P.2d 234 (1982), the Kansas Supreme Court adopted the test advanced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), to establish by indirect evidence a claim of disparate treatment in the workplace. The court stated:

"The burden of proof in a proceeding under the Kansas Acts Against Discrimination, K.S.A. 44-1001 *et seq.*, is on the complainant to prove by a preponderance of the evidence that the respondent is guilty of a discriminatory practice. Initially, the complainant must present a prima facie case of discrimination. Then the burden of going forward with the evidence shifts to respondent and this burden may be discharged by evidence of a legitimate, nondiscriminatory reason for respondent's conduct. Once the respondent discharges this obligation, the complainant must continue with the burden of proving by a preponderance of the evidence that the reasons offered by respondent were merely a pretext for discrimination."

The *McDonnell Douglas* test was the standard applied by the district court in considering Jackson's claim. We are satisfied after an exhaustive review of the evidentiary record that there was substantial competent evidence to support the trial judge's findings and conclusions that Garvey had a "legitimate, nondiscriminatory reason" for Jackson's role in the bin cleaning project; we further conclude the district court's negative finding that Jackson failed to prove Garvey's reasons were pretextual is not arbitrary or otherwise unsupportable from the evidence produced at hearing. Because reasonable minds could disagree as to whether Jackson carried his

burden of proof, the decision of the district court as factfinder must stand upon the issue of disparate treatment.

There remains the issue of constructive discharge. We have already stated that Jackson was subjected to a hostile work environment as a result of Bell's continuous barrage of racial epithets. Upon remand, the district court must consider whether the discriminatory acts were sufficient to establish a constructive discharge from employment. The district court's inquiry should focus on " 'whether the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.' " *Ramsey v. City and County of Denver*, 907 F.2d 1004, 1010 (10th Cir. 1990) (quoting *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 [10th Cir. 1986]).

We have carefully considered all of the other issues raised by Jackson, but conclude they are without merit.

Reversed and remanded with directions to consider whether Jackson was constructively discharged from employment and, if so, the nature and extent of the award to be entered pursuant to K.S.A. 44-1005.